UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD DISHMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 07 C 5626 |
| | ) | |
| THOMAS CLEARY, KEITH DEITELHOFF, | ) | Judge George M. Marovich |
| PATRICK O'KELLY, DAVID DIMOFF, | ) | |
| MARK CAMPBELL, ANDREW OHLSON, | ) | |
| CHRISTOPHER BROWN, MICHAEL | ) | |
| BROWN, MORRIS BROWN, WALTER | ) | |
| BROWN, EDDIE HAYNIE and other | ) | |
| unknown Chicago Police Officers, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Richard Dishman filed a three-count complaint against defendants Thomas Cleary ("Cleary"), Keith Deitelhoff ("Deitelhoff"), Patrick O'Kelly ("O'Kelly"), David Dimoff ("Dimoff"), Mark Campbell ("Campbell"), Andrew Ohlson ("Ohlson"), Morris Brown, Walter Brown, Christopher Brown, Michael Brown and Eddie Haynie ("Haynie"). Defendants Campbell, Cleary, Deitelhoff, Dimoff, Ohlson, Haynie and O'Kelly move for summary judgment on plaintiff's claims.[1] For reasons set forth below, the Court grants in part and denies in part defendants' motion for summary judgment.

**I.   Background**

Unless otherwise noted, the following facts are undisputed.[2]

---

[1]Plaintiff previously dismissed defendants Morris Brown, Walter Brown, Christopher Brown and Michael Brown. The unknown officers will be dismissed pursuant to Rule 4(m).

[2]Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. As the Court notes on its website (and has mentioned in multiple opinions), the Court enforces Local Rule 56.1 strictly.

On October 12, 2005, plaintiff Dishman was arrested. While he was in lock-up, he stomped on and broke the toilet in his cell. Not long after that, Dishman was tased.

Of the eleven Chicago Police Officers Dishman sued in this case, claims are still pending against seven–Cleary, Deitelhoff, Dimoff, Campbell, Ohlson, Haynie and Sergeant O'Kelly. On the night Dishman was arrested, Sergeant O'Kelly was working as a field supervisor and was assigned to supervise officers patrolling the 7th District. The other six defendants were among the officers assigned to the 7th District that evening.

On the day of his October 12, 2005 arrest, Dishman had gone to work at the same job he had held for ten years. Dishman was a distribution manager for a company that sold construction safety equipment. After work, Dishman drove his car to purchase a six-pack of 12-ounce cans of Icehouse beer. After he purchased the beer, he drove to Green Street and parked his car on the 6400 block. Dishman left five of the beers in his car and drank one on the porch of a house near where he parked. After he drank the beer, Dishman went back to his car to get another for a friend.

Dishman was arrested soon after he returned to his car. When Dishman reached his car, he sat down in the driver's seat. Four cans of Icehouse beer were sitting in the passenger seat next to him. (It is not clear from the record what happened to the other can of beer.) Dishman

---

Facts that are argued but do not conform with the rule are not considered by the Court. For example, facts included in a party's brief but not in its statement of facts are not considered by the Court because to do so would rob the other party of the opportunity to show that such facts are disputed. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004). It is not enough at the summary judgment stage for either party to *say* a fact is disputed. The Court considers a fact disputed *only* if both parties put forth admissible evidence of his or its version of the fact. Asserted "facts" not supported by deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes are not considered by the Court.

inserted the key and turned the ignition to roll down a window and light a cigar. When he turned the ignition, music began playing. The parties dispute the volume of the music–Dishman testified that the music could not be heard outside the car, while a neighbor and the police officers testified that music could be heard 75 feet away. Within three minutes, police officers approached Dishman's car.

What happened next is the subject of some dispute. The parties agree that two officers pulled alongside Dishman's car as Dishman had his hand on the key in the ignition, but the parties disagree as to which two officers pulled up. Dishman testified that the two officers were Cleary and Campbell. Defendants put forth evidence that the two officers were Cleary and Deitelhoff and that Campbell spent the entire shift elsewhere investigating a kidnapping. (Accordingly, references to Campbell's presence are from Dishman's perspective.) Dishman agrees that Deitelhoff was present, but he thinks Deitelhoff arrived shortly after Campbell and Cleary. Dishman agrees that, at the scene of his arrest, he did not interact with any officers other than Campbell, Cleary and Deitelhoff.

According to Dishman, Cleary said, "Grab him," and Campbell pulled Dishman out of his car by his jacket collar. Once Dishman was out of the car, Campbell pushed Dishman into Cleary. Dishman started hollering for help. Cleary grabbed Dishman's left arm, twisted it behind his back, jerked it three or four times and pushed Cleary toward the back of Dishman's car. Dishman's head hit the car. Cleary called for back-up, which arrived (in the form of Deitelhoff) within seconds. When Deitelhoff arrived, Cleary "snatched" Dishman off the car and pushed him into Deitelhoff, who grabbed Dishman's hair and handcuffed Dishman.

When Deitelhoff put Dishman in the back of the squad car, Dishman hit his head on the roof of the car. The resulting knot on his forehead lasted two days. The handcuffs were "really tight" and caused three permanent scars on Dishman's wrist. The pain in Dishman's wrist lasted

two days. To this day, Dishman experiences occasional numbness in that arm (although defendant put forth evidence that the numbness could have also resulted from a subsequent gunshot wound).

The parties dispute Dishman's behavior during the arrest. According to Dishman, he did not resist arrest. Defendants put forth evidence that Dishman was belligerent and aggressive. Deitelhoff ultimately wrote and issued Dishman four tickets: #484 for having a sound device that was too loud; #485 for having an open container of liquor in the car; #486 for operating an uninsured vehicle; and #487 for driving under the influence of alcohol.

Deiteloff drove Dishman to the 7th District police station. Once they arrived, Deitelhoff pulled Dishman out of the squad car by the handcuffs. On the way into the building, Deitelhoff purposefully pushed Dishman into the edge of the doorway, which caused a bruise on Dishman's shoulder. Someone (it is not clear who) put Dishman into an interview room and handcuffed his right hand to a railing.

Dishman was hollering as loudly as he could when Cleary and Campbell entered the interview room. Cleary approached Dishman to handcuff his left hand. Dishman "snatched" his arm away. Cleary jerked back saying "Ow ow." Deitelhoff heard Cleary scream, "You broke my hand." A sergeant who was passing by told Dishman, "Now you got battery against a police officer." The parties dispute whether Dishman actually injured Cleary. According to Dishman, the reason he jerked his arm away was because Campbell looked menacing and was wearing gloves. Dishman wanted to cover his face. Dishman was then left in the interview room alone for ten minutes before he was fingerprinted and allowed to make a phone call.

Dishman was then escorted to a ten foot by four foot cell. The guard who escorted Dishman told him he was being charged with driving under the influence of alcohol. After about fifteen minutes, Dishman began yelling and screaming. He hollered that he wanted to take a test.

(Dishman had not been offered a breathalyzer test.) He hollered that he wanted to talk to his lawyer. Dishman hollered at the top of his lungs. This is when Dishman decided to break the toilet, because he was mad and upset. Dishman testified at his deposition that he purposefully "stomped" on the toilet until it detached from the wall and broke into three large pieces. Water started leaking onto the floor.

That evening, Lt. Mark Harmon ("Harmon") was the acting watch commander at the 7th District police station. Lt. Harmon decided, for safety reasons, that Dishman needed to be moved to another cell–one without broken pieces of porcelain and a wet floor. Harmon told O'Kelly that if Dishman refused to leave the cell, they would have to use a taser on him.

When Harmon and O'Kelly reached Dishman's cell, they heard Dishman screaming and yelling. They saw broken porcelain and a wet cell. Defendants put forth evidence that Dishman had a piece of broken porcelain in his hand and was swearing, but Dishman disputes this. What is undisputed is that when O'Kelly told Dishman he needed to come out of the cell, Dishman said he wanted to talk to a lawyer. Dishman did not *say* he would not come out, but he stayed at the back of the cell when he was told to come out. O'Kelly activated the taser, which caused a red light to shine on Dishman. Harmon ordered O'Kelly to deploy the taser. O'Kelly tased Dishman once for between five and eight seconds. Dishman's pain was excruciating, and he pull the taser prongs out of his body to stop the electricity. O'Kelly told Dishman he had better come out of the cell and asked him whether he wanted more. Dishman said he would come out, and he was escorted to a safer cell.

Later, Dishman was charged with two additional offenses. Dishman was charged with misdemeanor battery to Officer Cleary and criminal damage to property in excess of $300. The second offense was a felony.

It is undisputed that defendants Haynie, Dimoff and Ohlson were not involved in Dishman's arrest and did not have any physical contact with him on October 12, 2005. The only involvement Dimoff and Haynie had with Dishman was to do the paperwork for the battery charge.

Later, Dishman plead guilty to lesser charges. On November 29, 2005, Dishman plead guilty to a misdemeanor property damage charge. Three (##484, 485 and 486) of the four tickets Deitelhoff issued were dismissed pursuant to a *nolle prosequi* order. The fourth ticket–for DUI–was transferred to the traffic division.

Once in the traffic division, the state reduced the ticket from driving under the influence of alcohol to negligent driving in exchange for a guilty plea. Here is what transpired in court on August 24, 2006:

| | |
|---|---|
| The Court: | And if I'm understanding correctly it's counsel's belief that the state would be able to present evidence that would result in a finding of guilty on this charge. |
| Dishman's counsel: | We would stipulate that the state would present evidence that could sustain a finding of guilty, yet we maintain our innocence in those allegations. |
| The Court: | All right. And counsel further has presented case law including People verses Starks (phonetic) that provides that–and it is an Illinois case 30 Ill Ap 3rd, 541. I have it provides that it is not improper to accept a plea under those circumstances. So I am willing to accept the plea with the–if I remember correctly an agreed upon sentence of a $300 fine, six month supervision. And the only other cost of the matter are the clerk's cost of 30; . . . |

(Transcript at 9-10).

On October 4, 2007, Dishman filed suit in federal court. Defendants have moved for summary judgment.

## II. Summary judgment standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III. Discussion

### A. Parties' evidence motions

Before the Court considers the merits, it has two threshold motions to consider. First, plaintiff has moved for leave to file an exhibit that he failed to file when he responded to defendant's motion for summary judgment. The eight-page exhibit, which was intended as exhibit D to plaintiff's statement of additional facts, contains photocopies of eight photographs. Plaintiff's counsel was unable to file exhibit D at the time she filed plaintiff's statement of facts. Plaintiff's counsel received an error message from the court's electronic docketing system ("CM/ECF"), because the file was larger than the allowable 5.0 megabytes. Plaintiff's counsel

telephoned the CM/ECF help desk and was told to divide the exhibit in two and file them as Exhibit D1 and D2. Plaintiff's counsel did not do so. Instead, she emailed exhibit D to defense counsel and did not provide it to the court.

More than a month passed, and plaintiff still did not file exhibit D with the court. It was not until after defendant filed its reply brief and its response to plaintiff's statement of additional facts that plaintiff filed a motion with the Court seeking leave to file exhibit D. Essentially, plaintiff's counsel is asking for a retroactive extension of time.

Pursuant to Rule 6(b), a court may extend the time for filing "on motion made after the time has expired if the party failed to act because of excusable neglect." *Fed.R.Civ.P.* 6(b)(1)(B). Had plaintiff filed a motion to file exhibit D in the two or three days after his counsel had difficulty filing exhibit D, the Court would have had no trouble finding excusable neglect. Plaintiff, however, offers no explanation for the passage of more than a month before he requested leave. A party must do better than offering no explanation when attempting to convince a court to excuse his neglect to file an exhibit in support of a statement of facts until after the other side has already timely filed its response to that statement of facts. Accordingly, the Court denies the motion to file exhibit D.

The second preliminary motion is defendants' motion to strike certain of plaintiff's exhibits. As defendant points out, plaintiff included as exhibits four documents (Exhibit C, a Chicago Police Department Event Query; Exhibit E, a photograph; Exhibit G, medical records; and Exhibit F, a "Tactical Response Report") without including an affidavit to provide a foundation and to explain how the documents fall within an exception to the hearsay rule. *Thanongsigh v. Board of Ed.*, 462 F.3d 762, 777-778 (7th Cir. 2006). Nor has plaintiff shown

that defendants have otherwise conceded the accuracy of the documents. *Id.* Accordingly, the Court grants the motion to strike the exhibits. The Court notes, however, that this decision does not affect the outcome of the case. When plaintiff cited these exhibits, he also cited deposition testimony supporting each asserted fact.

### B. Plaintiff's claim for false arrest

In Count I, plaintiff seeks relief under § 1983 for false arrest.

Defendants O'Kelly, Haynie, Dimoff and Ohlson move for summary judgment on Count I on the grounds that they were not involved with plaintiff's initial arrest. An individual can be liable under § 1983 only if he caused or participated in the constitutional deprivation. *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). Dishman agrees that, at the scene of his arrest, he did not interact with any officers other than Campbell, Cleary and Deitelhoff. It is undisputed that defendants Haynie, Dimoff and Ohlson were not involved in Dishman's arrest and did not have any physical contact with him on October 12, 2005. Accordingly, defendants O'Kelly, Haynie, Dimoff and Ohlson are entitled to judgment as a matter of law on Count I. The Court grants summary judgment to defendants O'Kelly, Haynie, Dimoff and Ohlson as to Count I.

With respect to the remaining defendants (Campbell, Cleary and Deitelhoff), defendants make two arguments: that Dishman's guilty plea estops him from denying probable cause and that the claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).

As defendants point out, probable cause for arrest is an absolute defense to plaintiff's false arrest claim. *Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006). Defendants argue that Dishman's guilty plea to the negligent driving charge establishes probable cause. Defendants do not argue that the undisputed facts otherwise establish probable cause.

Defendants' probable cause argument is essentially a preclusion argument. Because Dishman was convicted in state court, this Court must consider the preclusive effect of his conviction under state law. *Reynolds v. Jamison*, 488 F.3d 756, 762-763 (7th Cir. 2007). Under Illinois law, a court must consider estoppel on a case-by-case basis. *Talarico v. Dunlap*, 177 Ill.2d 185, 191 (Ill. S.Ct. 1997). The "minimum threshold" for applying collateral estoppel under Illinois law is: "(1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Talarico*, 177 Ill.2d at 191. A court must also consider the criminal defendant's incentive to litigate. *Talarico*, 177 Ill.2d at 191. *Reynolds v. Jamison*, where the plaintiff asserted a false arrest claim after pleading guilty to telephone harassment, is instructive. There, the Seventh Circuit said:

> [T]he existence of probable cause and a finding of guilt are two distinct issues. Because [plaintiff] did plead guilty to making a threatening phone call to [the victim], it is tempting to say, *ex ante*, that [defendant's] belief that [plaintiff] had committed the offense of telephone harassment must have been reasonable. However, there is no evidence that [plaintiff's] guilty plea established what [defendant] knew at the time of the arrest–the relevant time period for the probable cause analysis. Thus, we decline to conclude that [plaintiff's] § 1983 claim is barred by collateral estoppel.

*Reynolds*, 488 F.3d at 766.

Here, defendants have not convinced that Court that collateral estoppel applies. When Dishman plead guilty to the negligent driving charge, he stipulated that the state would present evidence that could sustain a finding of guilty; but, the record does not contain information about what evidence the state would have presented. Thus, it is not clear whether the guilty plea

established probable cause. Accordingly, the Court does not conclude that collateral estoppel bars plaintiff's false arrest claim.

Defendants also argue that plaintiff's false arrest claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). There, the Supreme Court held that "in order to recover damages for . . . harm caused by actions whose unlawfulness would render a conviction or sentence invalid," a § 1983 plaintiff must first prove the sentence was reversed, expunged or otherwise declared invalid. *Heck*, 512 U.S. at 486-487. As an example of a case "whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful," the Court noted that a state defendant convicted of resisting arrest (an element of which is a *lawful* arrest, i.e., arrest with probable cause) could not bring a § 1983 claim for false arrest, because proving the claim would require the plaintiff "to negate an element of the offense of which he has been convicted." *Heck*, 512 U.S. at 486 n. 6.

Not all false arrest claims, however, undermine convictions. *Booker v. Ward*, 94 F.3d 1052, 1056 ("one can have a successful wrongful arrest claim and still have a perfectly valid conviction."). In *Reynolds v. Jamison*, 488 F.3d 756 (2007), for example, the plaintiff brought a false arrest claim even though he had plead guilty to telephone harassment. The Seventh Circuit explained:

> In the present case, [plaintiff's] § 1983 claim for false arrest does not impugn the validity of his underlying conviction for the offense of telephone harassment. Whether [the arresting officer] had probable cause to arrest [plaintiff] has no bearing on the validity of his subsequent guilty plea and criminal conviction.

*Reynolds*, 488 F.3d at 767. Here, as in *Reynolds* (and unlike the Supreme Court's example in *Heck*–where *lawful* arrest was an element of the crime), probable cause was not an element of the crime to which Dishman plead guilty. Whether the officers had probable cause to arrest

Dishman had no bearing on the validity of his plea.  Dishman's claim for false arrest is not barred by *Heck*.  Accordingly, defendants Campbell, Cleary and Deitelhoff have not shown that they are entitled to judgment as a matter of law on Count I.  The Court denies defendants Campbell, Cleary and Deitelhoff summary judgment on Count I.

> C. **Plaintiff's claim for excessive force**

In Count II, plaintiff seeks relief under § 1983 for excessive force during his arrest on Green Street and for being subjected to a Taser while he was in lock-up.

As with the false arrest claim, defendants Haynie, Dimoff and Ohlson argue that they are entitled to summary judgment on Count II, because they were not involved.  Dishman agrees that, at the scene of his arrest, he did not interact with any officers other than Campbell, Cleary and Deitelhoff.  It is undisputed that defendants Haynie, Dimoff and Ohlson did not have any physical contact with him on October 12, 2005.  Accordingly, defendants Haynie, Dimoff and Ohlson are entitled to judgment as a matter of law on Count II.  The Court grants summary judgment to defendants Haynie, Dimoff and Ohlson as to Count II.

Defendants Campbell, Cleary and Deitelhoff move for summary judgment on Count II on the grounds that the force used during Dishman's arrest was reasonable as a matter of law.  The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their person, house, papers, and effects, against unreasonable searches and seizures." Const. Amend. IV.  The court analyzes claims of excessive force during arrest under the Fourth Amendment's "objective reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 495 (1989).  The test for reasonableness does not lend itself to mechanical application.  Rather, "its proper application requires careful attention to the facts and circumstances of each particular

case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. Reasonableness is considered not from hindsight but from the perspective of a reasonable officer at the scene. *Graham*, 490 at 396. The test is objective, and the officer's intentions (whether good or bad) do not matter. *Graham*, 490 at 397. As the Seventh Circuit has recognized, "summary judgment is often inappropriate in excessive force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus v. Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).

In this case, although the parties dispute which officers were present, the parties do not dispute the amount of force used (or at least the defendants are accepting Dishman's version for purposes of their motion for summary judgment). The facts are that Campbell pulled Dishman out of the car by his collar and pushed him into Cleary. Cleary grabbed Dishman's left arm, twisted it behind his back and jerked it up three or four times before pushing Dishman toward the car, on which he hit his head. When Deitelhoff arrived, Cleary snatched Dishman off the car and pushed him into Deitelhoff, who grabbed Dishman's hair and handcuffed him tightly. When Deitelhoff put Dishman into the back of the squad car, Dishman hit his head again. Where the parties disagree is Dishman's behavior during the arrest. Dishman says that he was listening to quiet music when the officers appeared and that he never resisted arrest. Defendants say Dishman was belligerent and aggressive. If the jury believes Dishman, it could conclude that the force used was unreasonable.

Defendant argues that the force used here was no greater than the force held to be reasonable in *Smith v. City of Chi*, 242 F.3d 737 (7th Cir. 2001). There, officers "pulled [plaintiff] out of the car, pinned his arms behind his back, slammed him against the hood of his car, and handcuffed him." *Smith*, 242 F.3d at 744. The plaintiff had admitted that he had failed to pull over his car for a length of twelve blocks, and the Seventh Circuit granted summary judgment. It explained:

> A reasonable officer would have thought [plaintiff] was trying to flee, thereby justifying the use of a higher degree of force to protect the community and the officers than that needed for someone who committed only a minor traffic violation. However, the officers' use of force here was not high, let alone excessive.

*Smith*, 242 F.3d at 744. In *Smith*, it was reasonable–even under the plaintiff's version–for an officer to think the suspect was evading arrest because he failed to pull over for twelve blocks. Here, under Dishman's version, Dishman was merely sitting quietly in his car and did not, in any way, resist arrest. Although the Seventh Circuit mentioned that the level of force used in *Smth* was not high, the Court does not read *Smith* as setting a floor under which all force is reasonable. In any case, the force used here was greater–Dishman twice hit his head (the resulting knot lasted two days) and has permanent scars on his wrist from the tight handcuffs. A reasonable jury could conclude that the force used was unreasonable.

Defendants Campbell, Cleary and Deitelhoff have not shown that they are entitled to judgment as a matter of law with respect to Count II. Accordingly, the Court denies defendants Campbell, Cleary and Deitelhoff's motion for summary judgment on Count II.

Finally, the Court considers defendant O'Kelly's argument that he is entitled to summary judgment on Count II. Plaintiff claims that O'Kelly used excessive force when he deployed a

taser against Dishman while Dishman was in lock-up. Whether the Court considers Dishman's claim under the Fourth Amendment's objective-reasonableness standard (*See Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992) ("The Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made.") or under the Fourteenth Amendment (*see Forrest v. Prine*, 620 F.3d 739 (7th Cir. 2010) (considering an individual taken to county jail after arrest to be a pretrial detainee and, thus, applying Fourteenth Amendment to claim of excessive force), the outcome is the same. The force O'Kelly used was not excessive, as a matter of law.

In *Forrest*, the Seventh Circuit borrowed the Eighth Amendment's standards to analyze the Fourteenth Amendment claim. Under that standard, force used in a "'a good-faith effort to maintain or restore discipline,'" does not violate the detainee's constitutional rights, although force used maliciously or sadistically does. *Forrest*, 620 F.3d at 744 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

The undisputed evidence is that after Dishman had been in lock-up for about fifteen minutes, he started screaming and hollering at the top of his lungs. Because he was mad and upset, Dishman purposely "stomped" on the toilet until it detached from the wall and broke into three large pieces. Water started leaking onto the floor. Lt. Harmon decided that Dishman had to be moved for safety reasons and told Sgt. O'Kelly that if Dishman would not come out, he would have to be tased. When they reached Dishman's cell, they heard Dishman screaming and yelling, and they saw broken porcelain and a wet cell. When O'Kelly told Dishman to come out of the cell, Dishman said he wanted to talk to a lawyer. Dishman did not *say* he would not come out, but he stayed at the back of the cell instead of coming out. O'Kelly activated the taser,

which caused a red light to shine on Dishman. Harmon ordered O'Kelly to deploy the taser. O'Kelly tased Dishman once for between five and eight seconds. Dishman's pain was excruciating, and he pull the taser prongs out of his body to stop the electricity. O'Kelly told Dishman he had better come out of the cell and asked him whether he wanted more. Dishman said he would come out. Dishman was escorted to a safer cell.

The use of a taser is not inherently unreasonable. *See Lewis v. Downey*, 581 F.3d 467, 477 (7th Cir. 2009) ("In many circumstances–often when faced with aggression, disruption, or physical threat–compelling compliance with an order is a valid penological justification for the use of a taser."). Dishman argues that the use of force in this case was unreasonable because he was not asked more than once to leave his cell. In *Lewis*, for example, the Seventh Circuit was troubled both by the fact that the plaintiff had been given only a single order and by the short passage of time between the order and the use of the taser. *Lewis*, 581 F.3d at 478. The reason the Seventh Circuit was troubled by those facts, however, was because at the time he was tased, the prisoner in *Lewis* had been on a hunger strike for more than ten days and was lying sluggishly on his bunk. Under those circumstances, the Seventh Circuit concluded that more warning was necessary. The Seventh Circuit recognized, however, that warnings and delay would not always be necessary. *Lewis*, 581 F.3d at 478 ("In a jail or prison setting, it is not hard to imagine any number of scenarios that would justify the immediate and unadvertised use of summary force, including taser guns."). The officer in *Lewis* faced a very different scene than Sgt. O'Kelly faced in this case. The facts of this case are closer to the facts in *Forrest v. Prine*, 620 F.3d 739 (7th Cir. 2010), where the court concluded that the use of a taser was permissible.

*Forrest*, 620 F.3d at 745. There, the officer was in a small space with a large, seemingly intoxicated detainee, who was pacing, shouting and was slow to comply with an order.

In this case, even considering the facts from Dishman's perspective, the Court concludes, as a matter of law, that the use of force was both reasonable and constituted a good-faith effort to restore order. What Sgt. O'Kelly faced was an individual who had been screaming and hollering at the top of his lungs and who had stomped on the toilet until it broke into three pieces, allowing water to leak onto the floor. Clearly, it was reasonable to want Dishman out of that cell. The environment was a danger to Dishman (who could slip and fall onto the broken porcelain) and to the officers (because Dishman now had access to broken porcelain, which could be used as a weapon). It was also reasonable to demand that Dishman walk out of the cell on his own. It would have been dangerous to officers and to Dishman if officers had had to go into the cell to get Dishman, because the floor was wet, and Dishman had access to broken porcelain. (The Court notes that it is analyzing this under Dishman's version, which is that Dishman never actually picked up any porcelain.) When they ordered Dishman to come out of the cell, Dishman stood in the back of the cell and said he wanted a lawyer. Although he did not *say* he would not come out, he also failed to follow the order. The officers could not predict what Dishman would do next–he had previously stomped on a toilet until it broke. It was reasonable for Sgt. O'Kelly to use a taser on Dishman. It was a good-faith effort to restore order.

There are no genuine issues of *material* fact, and Sgt. O'Kelly is entitled to judgment as a matter of law. Accordingly, the Court grants Sgt O'Kelly summary judgment on Count II.

### D. Plaintiff's claim for malicious prosecution

In Count III, plaintiff asserts a claim for malicious prosecution. To establish malicious prosecution, plaintiff must show, "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Swick v. Liautaud*, 169 Ill.2d 504, 512 (Ill. S.Ct. 1996) (quoting *Joiner v. Benton Comm. Bank*, 82 Ill.2d 40, 45 (Ill. S.Ct. 1980)). To be considered one that terminates in plaintiff's favor, the "case must end for reasons indicative of plaintiff's innocence." *Ferguson v. City of Chi.*, 213 Ill.2d 94, 102 (Ill. S.Ct. 2004).

Defendants argue that plaintiff's claim is time-barred based on the one-year statute of limitations for tort claims against municipal employees. *Ferguson v. City of Chi.*, 213 Ill.2d at 99; 745 ILCS 10/8-101. It is undisputed that three tickets against Dishman were dismissed pursuant to a *nolle prosequi* order on November 11, 2005, more than a year before plaintiff filed suit on October 4, 2007.

Plaintiff agrees that the claim is time-barred. Still, plaintiff asserts that "an argument can be made" that because he plead guilty to negligent driving on August 24, 2006 and received court supervision until February 23, 2007, that the statute of limitations did not run until February 23, 2008. A problem with that argument, of course, is that that case did not end for "reasons indicative of plaintiff's innocence." To the contrary, it is undisputed that when Dishman plead guilty to negligent driving, he stipulated "that the state would present evidence that could sustain a finding of guilty." The negligent driving charge did not end for reasons indicative of innocence and, therefore, cannot support a claim for malicious prosecution.

Count III is time-barred, and defendants are entitled to judgment as a matter of law on that claim. Defendants' motion for summary judgment as to Count III is granted.

## IV. Conclusion

For the reasons set forth above, the Court grants in part and denies in part defendants' motion for summary judgment. The Court grants defendants Dimoff, Haynie, Ohlson and O'Kelly summary judgment on Counts I, II and III. The Court grants defendants Campbell, Cleary and Deitelhoff summary judgment on Count III. The Court denies defendants Campbell, Cleary and Deitelhoff summary judgment on Counts I and II.

ENTER:

George M. Marovich
United States District Judge

DATED: March 29, 2011